UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| JENNIFER MANIFASE,<br>    Plaintiff<br><br>v.<br><br>CITY OF PROVIDENCE, et al,<br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)   C.A. No. 1:19-CV-00506-MSM-PAS<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

This matter comes before the Court on the Motion for Summary Judgment of the defendants[1], the City of Providence ("City") and Providence Police Detective Ryan Moroney ("Detective Moroney"). (ECF No. 21.) For the following reasons, the Motion is DENIED.

### I.   BACKGROUND

On January 29, 2018, the plaintiff, Jennifer Manifase ("Ms. Manifase") was arrested on a larceny charge pursuant to a warrant obtained by Detective Moroney. (ECF No. 22 at 6.) Ms. Manifase's arrest drew her into a months-long legal process

---

[1] The two other defendants named in this lawsuit, Stop & Shop and Andrew Tougas, were previously dismissed.

1

that unceremoniously concluded with the City dismissing its case against her on the day her trial was set to begin. *Id.* The facts of this case read like an amateur sleuth mystery, with all the greenhorn gumshoeing, but none of the crime-solving.

On December 20, 2017, Ms. Manifase and her daughter visited the Stop & Shop Supermarket ("Stop & Shop") on West River Street in Providence. (ECF No. 22 at 5.) They parked their car, a silver Volvo sedan, near one of the store's entrances and went inside. *Id.* A vehicle belonging to one of Stop & Shop's security personnel, an asset protection specialist, Andrew Tougas ("Mr. Tougas"), was parked in the vicinity of the plaintiff's car. *Id.* Ms. Manifase and her daughter made their purchases without incident, exited through the same door they had entered, and made their way back to their parking space. *Id.* After loading their groceries, the mother and daughter got into their car and drove out of the parking lot. *Id.*

That same day, Mr. Tougas had arrived for his shift around 1:30 P.M. and parked his pick-up truck in his usual spot. (ECF No. 21-2 at 3.) Later, sometime between 7:00 P.M. and 8:00 P.M., Mr. Tougas took his mid-shift break. *Id.* He went out to his truck, got into the cab, began to drive out of the parking lot, and noticed that the toolbox affixed to the truck bed was open. *Id.* The toolbox had been latched that day, according to Mr. Tougas, but had been left unlocked. (ECF No. 22 at 5.) Upon inspecting the toolbox, Mr. Tougas discovered that a toolset – which he kept inside the toolbox – was missing. (ECF No. 21-2 at 3.) Mr. Tougas immediately returned to Stop & Shop and set about reviewing the store's parking lot security camera footage. *Id.* After watching the surveillance video, Mr. Tougas drew two

2

conclusions: first, that his toolset had been stolen from his truck during that day's shift and, second, that Ms. Manifase was the culprit and her minor daughter an accomplice.

In his review of the security footage, Mr. Tougas identified a silver Volvo pulled into a parking space a short distance from his own truck. There is no dispute that the Volvo belonged to Ms. Manifase, nor is it disputed that Ms. Manifase and her daughter went into the grocery store to make a purchase, that they came out of the grocery store, and, after a couple of minutes, that they both got into the Volvo and drove away. The dispute pertains to the inferences drawn by Mr. Tougas, and later by Detective Moroney, about Ms. Manifase and her daughter's activity in the three minutes they spent in the parking lot before entering Stop & Shop and, once they had made their purchases, in the three minutes they spent in the parking lot before driving away.

A pause is in order here, to describe the surveillance footage that Mr. Tougas relied upon to make his report to police and which Detective Moroney viewed before making his arrest warrant application. The surveillance footage provided to the Court is, in a word, limited. The defendants do not dispute that the security video is itself "grainy." (ECF No. 21-3 at 23, 28.) According to their Statement of Undisputed Facts "the video surveillance of the parking lot skips three seconds at a time, and it is difficult to pause it at any one spot. One has to watch it with the movement as it is playing to get the best observation of what it is depicting." (ECF No. 21-2 at 4.) The mere fact that the video must be viewed without pausing to glean whatever

information it might contain, diminishes its usefulness and erodes its reliability from the start.  While the activities of the plaintiff and her daughter are partially captured by the security camera, it is undisputed that they are frequently obscured by the parking lot's traffic, grocery store patrons, and signage.  Despite these manifest limitations, which are clearly exacerbated by the distance between the camera and Mr. Tougas' truck as well as by the other vehicles and pedestrians, Mr. Tougas decided based on what he could see in the surveillance video that the plaintiff took his toolset from the truck bed toolbox.

### A. Mr. Tougas Calls the Police

At 8:53 P.M., officers from the Providence Police Department responded to Mr. Tougas' call reporting his stolen Kobalt toolset. (ECF No. 21-1 at 12.)  Shortly thereafter, officers arrived at Stop & Shop to take Mr. Tougas' statement.  He handwrote his witness statement and specified, in relevant part, the following:

> At approximately 19:40 [7:40 P.M] I Andrew Tougas went outside to my truck (2004 Ford F-250) and noticed the toolbox was not closed properly as I began to drive away.  I then went to close the toolbox when I noticed my Kobalt 227 Socket Set in a blue [and] black case with 3 drawers was missing. *I then reviewed video and observed 2 females at approximately 16:15 [4:15 P.M.] go into the toolbox and remove my toolset and place it into their vehicle.*  The vehicle was a silver 4 door Volvo sedan.  The females were two white females one of which in approx. 30's black hair heavy set (180-200 lbs.) wearing a black "PINK" shirt.  The second female was in her early teens approx. 100-120 lbs.  The value of tool set is $200.00 I am awaiting the female information from her [s]tore card that she used at the store.  At the time of the theft [n]o tools were missing from the set.  I do wish to press charges.

*Id.* at 14 (emphasis added).

### B. Detective Moroney Investigates

At the time Mr. Tougas reported his stolen toolset, Detective Moroney was, and remains, a detective with the Providence Police Department. He was assigned to the case. Picking up where the responding officers left off, Detective Moroney visited Mr. Tougas at work on December 27, 2017, to conduct his investigation. According to Detective Moroney, he went "to the store so that Mr. Tougas could explain what he saw in the video." (ECF No. 21-2 at 4.) Detective Moroney then submitted an affidavit that presented Mr. Tougas' impressions as though they were directly observed facts. As highlighted below, the glaring issue in this case is the discrepancy between "what [Mr. Tougas] saw in the video" and what both Mr. Tougas and Detective Moroney have conceded is *actually* in the video. In his answers to the plaintiff's interrogatories, Detective Moroney described the contents of the security video.

> My observations, as supplemented by Tougas, *showed the plaintiff walk over to the area of the rear bed of the truck, disappear from view for a period, reappear, then seem to jump down from the rear bed area, walkover* [sic] *to the rear passenger door of the Volvo, open the door, close the door, walk to and enter the driver's seat,* exit the vehicle, then walk back to the rear passenger door, open it, close it, then return to the driver's seat and drive off.

(ECF No. 22-3 at 9) (emphasis added).

The affidavit that Detective Moroney submitted to support his application for an arrest warrant differed in several respects from the answers to interrogatories. In the affidavit, instead of noting that the plaintiff disappeared from view, Detective

5

Moroney described seeing behavior similar to what Mr. Tougas had described. The warrant affidavit reads:

> On 12/20/2017 at approximately 1940 hours [7:40 PM] Andrew Tougas DOB 09/10/92 observed the tool box to his vehicle, RI Comm. Reg. 69555 (2004 Ford F-250), to be open while driving home from his place of employment located at 333 West River St, Stop and Shop. Tougas then observed his Kobalt 227 piece socket set in a blue and black case with 3 drawers was missing from the tool box. Tougas is a loss prevention officer for Stop and Shop and has access to the store's surveillance system and recordings. Tougas returned to the store and viewed on the store's surveillance recordings a silver Volvo (plate unknown) park next to his vehicle at approximately 1540 hours [3:40 P.M.]. At approximately 1543 hours [3:43 P.M.] *the unidentified passenger of this vehicle (described as W/F in her early teens approximately 100-120 pounds) looked into the truck bed of Tougas' vehicle after she exited the silver Volvo.* She then walked into the Stop and Shop Store with the operator (described as a heavy set W/F approximately 180-200 pounds in her thirties wearing a black "PINK" shirt) of the silver Volvo. The 2 females then purchased items in the store and used a Stop and Shop Loyalty card that was issued to Jennifer Manifase and Sharon Manifase. The 2 females then left the store at approximately 1615 hours [4:15 P.M.] and walked back to their vehicle (silver Volvo) which was still parked next to Tougas' vehicle, RI Comm Reg. 69555. The 2 females then put their purchased items from Stop and Shop into their vehicle (silver Volvo) and *at approximately 1616 hours [4:16 P.M.] the female operator of the silver Volvo walked over to Tougas' vehicle, RI Comm. Reg. 69555, reached into the truck bed and removed from the vehicle's tool box the Kobalt 227 piece socket set in a blue and black case with 3 drawers. The female operator then placed the socket set into her vehicle* and fled the scene in her vehicle (silver Volvo) at approximately 1618 hours [4:18 P.M.].
>
> Tougas called the police and a report was made for the larceny from the auto at approximately 2053 hours [8:53 P.M.] on 12-20-17.

6

> Tougas provided police with surveillance recordings of this incident along with still photos of the 2 females involved in this incident. The Stop & Shop loyalty card information that was used by these two females was also provided to Detective Moroney.
>
> Through the use of social media, "Facebook," photos of Jennifer Manifase Silvestri DOB 10/01/71 were obtained and they matched the female operator (described as a heavy set [sic] W/F approximately 180-200 pounds in her thirties wearing a black "PINK" shirt) of the silver Volvo from the Stop and Shop surveillance recordings. Manifase also had photos on social media, "Facebook," of a silver Volvo belonging to her.
>
> A check of NCIC/local came back with a RI operator license (#3096838) for Jennifer Manifase DOB 10/01/71 with an address of 35 Gillen St Fl. 1 Providence. Manifase's license photo also matched the photos from the Stop and Shop surveillance recordings along with the "Facebook" photos. Detective Moroney observed parked outside Manifase's residence, a silver Volvo bearing RI Reg. CW457 (No Record Found) that matched the silver Volvo from the Stop and Shop surveillance recordings along with Manifase's "Facebook" photos.
>
> Based on the facts and circumstances I request a warrant be issued for Jennifer Manifase DOB 10-01-71 for one count of larceny from the auto in violation of RIGL 11-41-1.

(ECF No 21-1 at 18-19.) Notably absent from Detective Moroney's warrant affidavit are any indications of the surveillance video quality and any approximation of the distance at which it was recorded. The affidavit also differs from Mr. Tougas' original statement in which he claimed that both Ms. Manifase and her daughter took the toolset from his truck. In his affidavit submitted in support of the instant motion for summary judgment, Detective Moroney states that "[a]s [he] watched the video, the parking lot footage was shot from a greater distance and actual facial features etc.

7

cannot be detected." *Id.* at 2.  The "etc." captures a universe of events and details that are not discernible or are entirely absent from the video.  Indeed, Detective Moroney has provided this Court with yet another description of the same video footage in support of summary judgment relative to the period in which the plaintiff allegedly reached into Mr. Tougas' truck and removed his toolset.

> The parking lot footage later depicts the plaintiff walking left to right toward the Volvo pushing a shopping carriage. Her daughter is with her.  They arrive at the Volvo *and their view is often obscured from other vehicles passing by, the glare of lights and the quality of the film.*  At one point, the rear passenger door is seen to be opened and then *a figure* traverses left to right from the Volvo toward the rear truck bed area of Tougas' vehicle.  It is *a shadowy figure* as it traverses on that path but as I continued to watch the figure, it remains toward the right rear of the pick-up bed, the *view obscured by the truck*.  Approximately 14 seconds later, the white distinctive "PINK" letters can be seen.  As we toggled the video, *the figure* can be seen *coming from a high position on the side of the truck and dropping down to a lower position* where she then walked back, right to left to the Volvo to the rear passenger door, *and appears to bend down as if placing something into the vehicle*.

*Id.* (emphasis added).  This account, again based upon viewing the exact same footage as reviewed with Mr. Tougas on December 27, 2017, differs in several ways from the affidavit presented to the bail commissioner who signed the warrant.  Rather than articulating what is *actually* depicted in the video that he had the opportunity to review and which served as the only basis for Mr. Tougas' claim against Ms. Manifase, Detective Moroney described what he and Mr. Tougas *inferred* from the surveillance footage but presented that inference as though the video actually showed the plaintiff "reach[ing] into the truck bed and remov[ing] from the vehicle's tool box

8

the Kobalt 227 piece socket set." *Id.* at 19. Simply put, and according to the undisputed facts presented to the Court, the video did nothing of the sort. At the very most, the surveillance footage can be said to capture, in an almost stop-motion fashion, movement in the vicinity of Mr. Tougas' truck, where Ms. Manifase acknowledges she parked her car when she went grocery shopping. The parties, as well as the complaining witness, all agree that the surveillance footage does not show Ms. Manifase "reaching into" Mr. Tougas' truck. (ECF No. 21-3 at 28, 43; ECF No. 23 at 9.) Nor does it depict Ms. Manifase "plac[ing] the socket set into her vehicle." *Id.* The defendants further acknowledge that Ms. Manifase's exact proximity to the truck is unknown. *Id.*

The bail commissioner, presented with Detective Moroney's affidavit that included Mr. Tougas' embellished inferences as facts, signed the arrest warrant.

### C.  Ms. Manifase is Arrested

At 8:30 A.M on January 29, 2018, two days after the warrant issued, a patrol officer in the process of towing the plaintiff's Volvo for unrelated vehicle violations, identified Ms. Manifase on the street and arrested her. *Id.* at 8. After spending two hours in a cell at the police department, she was arraigned and released. *Id.*

### D.  The Trial That Wasn't

Several pretrial conferences were held between January and June of 2018. At each of them, Ms. Manifase was required to appear, and she did appear. Finally, on June 4, 2018, the same day her trial was set to begin, the city dismissed its case against Ms. Manifase. (ECF No. 1-2 at 2.)

9

### E. Epilogue

Jennifer Manifase brought a lawsuit in Rhode Island Superior Court against Stop & Shop, Mr. Tougas, Detective Moroney, and the City of Providence. Since then, Stop & Shop and Mr. Tougas have been dismissed from the case and Detective Moroney petitioned for removal to this Court (ECF No. 1). The following counts remain: Count I for False Imprisonment against the City and Detective Moroney; Count III for Wrongful Arrest against the City and Detective Moroney; Count V for Malicious Prosecution against the City and Detective Moroney; and Count VII asserting a Fourth Amendment violation pursuant to 42 U.S.C. § 1983 against Detective Moroney. *Id.*

The City and Detective Moroney have moved for summary judgment on all counts and Detective Moroney has asserted entitlement to qualified immunity. (ECF No. 21.) In response to the plaintiff's allegations that Detective Moroney included false information in his arrest warrant affidavit and that no probable cause existed to seek a warrant, to make an arrest, or to prosecute Ms. Manifase, the defendants maintain that the statement made by Mr. Tougas combined with the security camera footage provided more than enough support for probable cause to arrest Ms. Manifase for larceny. *Id.*

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment's role in civil litigation is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990). Summary judgment is appropriate

when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact. *Id.* at 49. "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000).

In ruling on a motion for summary judgment, the Court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." *Feliciano de la Cruz v. El Conquistador Resort & Country Club*, 218 F.3d 1, 5 (1st Cir. 2000) (citing *Mulero–Rodriguez v. Ponte, Inc.,* 98 F.3d 670, 672 (1st Cir. 1996)). "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I*, 53 F.3d 454, 460 (1st Cir. 1995). Furthermore, "[s]ummary judgment is not appropriate merely because the facts offered by the moving party seem more plausible, or because the opponent is unlikely to prevail at trial. If the evidence presented 'is subject to conflicting interpretations, or reasonable [people] might differ as to its significance, summary judgment is improper.'" *Gannon v. Narragansett Elec. Co.*, 777 F. Supp. 167, 169 (D.R.I. 1991) (quoting 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice & Procedure,* § 2725, at 106-09 (1983)).

11

### III. DISCUSSION

Because the Court finds that the evidence presented in this case regarding the material issue of probable cause "is subject to conflicting interpretations" and finds that a reasonable jury could make a finding in the plaintiff's favor, summary judgment is not appropriate. Whether probable cause existed in this case influences the outcome of each of Ms. Manifase's claims against the defendants.

#### A. Section 1983 and the Fourth Amendment Violation

The Fourth Amendment to the United States Constitution protects "against unreasonable searches and seizures" in part through the edict that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." U.S. Const. amend. IV. Ms. Manifase's lawsuit boils down to her right to security in her person, and it is from the alleged Fourth Amendment violation that her claims for wrongful arrest, false imprisonment, and malicious prosecution flow. As explained below, the reasonableness of conflicting conclusions about whether there was probable cause to arrest, detain, or prosecute Ms. Manifase prevents this Court from granting summary judgment in favor of the defendants.

##### 1. Probable Cause

"Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime." *United States v. Young*, 105 F.3d 1, 6 (1st Cir. 1997) (citations omitted). Where a warrant has issued

12


for an arrest, the First Circuit instructs district courts to "pay great respect to the issuing magistrate's determination of probable cause." *United States v. Tanguay*, 787 F.3d 44, 49 (1st Cir. 2015) (citing *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). Such deference, however, is not absolute and "[w]here relevant information has been withheld from the magistrate . . . the district court must probe the existence of probable cause anew." *Id.* (citing *United States v. Gifford*, 727 F.3d 92, 99 (1st Cir. 2013)).

### 2. Warrant Affidavit

In seeking a warrant for arrest, an officer "should include in the affidavit accompanying the warrant application any facts known to her that are material to the existence" of probable cause. *Id.* at 46. Material facts include "what the police knew at the moment of arrest, the source of their knowledge, and leads they pursued or eschewed . . . ." *Acosta v. Ames Dep't Stores, Inc.*, 386 F.3d 5, 9 (1st Cir. 2004) (citation omitted). Making a false statement in or omitting material facts from a warrant affidavit serve as bases on which to challenge a finding of probable cause. *Tanguay*, 787 F.3d at 48-49. In the suppression of evidence context,

> the Supreme Court established that, under the Fourth and Fourteenth Amendments, a defendant is entitled to an evidentiary hearing to test the veracity of a warrant affidavit if he can make a substantial showing that the affiant intentionally or with reckless disregard for the truth included a false statement in the affidavit, which statement was necessary to the finding of probable cause.

*Id.* (citing *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)). As for omissions, the exclusion "first . . .must have been either intentional or reckless; and second, . . . if

incorporated into the affidavit, must be sufficient to vitiate probable cause." *Id.* at 49. (citations omitted). In *Jordan v. Town of Waldoboro*, the First Circuit considered the validity of a warrant affidavit and an officer's personal liability in the § 1983 context and drew from *Franks* "[t]he rules for challenging a warrant by attacking the affidavit used to procure it. . .." 943 F.3d 532, 540 (1st Cir. 2019) (citing *Franks*, 438 U.S. at 154). In so doing, the Circuit has held that "'[a]n officer who obtain[ed] a warrant through material false statements which result[ed] in an unconstitutional search may be held personally liable for his actions under §1983.'" *Id.* at 540-41 (quoting *Aponte Matos v. Toledo Davila*, 135 F.3d 182, 187 (1st Cir. 1998) (alterations in original).

The first task of the Court is to determine whether the warrant affidavit was misleading, either because it omitted material facts or presented Mr. Tougas' theories as fact. In either event, the plaintiff contends, Detective Moroney's affidavit overstated the information relevant to probable cause and, therefore, the arrest warrant is void. To determine whether the warrant must be voided in this case, the Court can assess the undisputed facts in this case considering the *Franks*-inspired framework crafted by the First Circuit: "[t]he affidavit need contain a falsehood; the falsehood must be such that its deletion would eliminate probable cause; and the falsehood must have been made deliberately, or at least with reckless disregard for the truth." *Id.* at 541. The Court is not confined to reviewing the affidavit "only for affirmative misrepresentations, but also for material misrepresentations." *Id.* (citing *Tanguay*, 787 F.3d at 49).

In this case, the following facts are certain: Detective Moroney met with Mr. Tougas and reviewed the security video one week after Mr. Tougas made his original witness statement, Detective Moroney submitted an affidavit along with his arrest warrant application that both included an affirmatively inaccurate statement of the video's content and, at the same time, failed to include a truthful description of the video's "grainy" quality which would have precluded Mr. Tougas from seeing what he claimed to have seen. The defendants have admitted that the surveillance footage *does not show* Ms. Manifase reaching into Mr. Tougas' truck or removing the toolset or placing the toolset into her own vehicle. Detective Moroney, nevertheless, stated in his warrant affidavit that *it does*. Although the affidavit was presented in terms of Mr. Tougas' statements and Mr. Tougas' description of the surveillance footage, the affidavit also indicates that Mr. Tougas' statements were derived from the video. To misrepresent the video – either because the video did not correspond exactly with what Mr. Tougas' described or because inferences were made to fill gaps – is, to put it lightly, problematic. Detective Moroney had the opportunity to see the surveillance footage himself. That footage embodied all of the facts available to Mr. Tougas. Detective Moroney, with ample access to the exact same video, had the obligation to evaluate the footage himself and to clarify, rather than obscure, the points at which Mr. Tougas' statements and the surveillance footage were contradictory.

Detective Moroney cannot, consequently, hide behind Mr. Tougas' interpretation of the surveillance footage. This is not a case in which any complicating factors or exigency affected Detective Moroney's ability to carefully

scrutinize the video or draft a complete and accurate account of the basis for seeking an arrest warrant for Ms. Manifase. Detective Moroney also had a copy of the surveillance footage to which he could refer as he prepared his affidavit. Based upon the record in this case, however, and despite the luxury of time, the affidavit was not accurate. Detective Moroney and Mr. Tougas have both acknowledged that the video does not show Ms. Manifase reaching into the truck, removing the toolset, or placing the toolset into her vehicle. When asked at his deposition whether the video showed Ms. Manifase taking the toolset out of the truck, Detective Moroney replied, "No, not on the video." (ECF No. 23 at 9.) If that is true – that is, the actual extent of video's content does not include footage of Ms. Manifase taking the toolset – then it follows that the warrant affidavit contained a falsehood because it described precisely the opposite set of facts, namely that the video enabled Mr. Tougas to observe Ms. Manifase reaching into the truck, removing the toolset, and placing the toolset into her vehicle.

The defendants argue in their Reply that the plaintiff cannot rely on Mr. Tougas' deposition testimony that he did not "[s]ee the plaintiff approach within five feet of Tougas' truck" to demonstrate that Detective Moroney "deliberately lied or fabricated evidence material to the finding of probable cause or, in the alternative, must have made assertions that were in deliberate or reckless disregard for the truth." (ECF No. 23 at 2.) Instead, they argue the warrant is valid because Detective Moroney "accurately stated in substance, and almost to the word, the victim's (i.e. Tougas') observations and complaining facts." *Id.* "If Tougas was wrong or

16

inaccurate, that cannot be charged to defendant Moroney." *Id.* Despite the defendants' invitation, the Court declines to view the affidavit in a vacuum. The existence of the surveillance footage in this case exposes the inaccuracy of the affidavit and the Court finds that Detective Moroney made both omissions and false statements in his application for an arrest warrant.

The next question is "whether a more complete and accurate affidavit would have nevertheless supported a finding of probable cause for the . . . seizure." *Jordan*, 943 F.3d at 541. The Court is mindful that "only a jury can resolve reasonably disputed issues of fact, [but] whether a given set of facts constitutes probable cause is a legal question." *Id.* (citations omitted). There is no question that the video contents and the affidavit description do not match. Nevertheless, reasonable minds could differ as to whether a reformed affidavit would establish probable cause given the reasonable inferences that may be drawn from a comprehensive recitation of the facts available to Detective Moroney at the time he applied for the warrant, including what is actually shown in the video.

If the finder of fact were to determine that a complete and accurate affidavit would not establish probable cause, then the third and final inquiry is whether Detective Moroney acted intentionally or with reckless disregard for the truth. In any event, an evaluation of the competing interpretations of the evidence in this case is not properly resolved by the Court at this stage.

### B. Qualified Immunity

Detective Moroney has argued that he is entitled to qualified immunity from

17

liability. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation omitted). To determine whether a defendant is entitled to qualified immunity, a court inquires "(1) whether the facts alleged or shown by a plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009). The second step is in turn made up of two prongs: (1) "the clarity of the law at the time of the alleged civil rights violation" and (2) "whether, on the facts of the case, a reasonable defendant would have understood that his conduct violated the Plaintiff's constitutional rights." *Estrada v. Rhode Island*, 594 F.3d 56, 63 (1st Cir. 2010) (internal quotations omitted).

As explained in the previous section, there are questions of material fact that must be resolved before evaluating the rectified affidavit; whether there was probable cause, and, if not, whether any reasonable officer would have known his actions violated the plaintiff's rights. The Court therefore defers judgment on the issue of qualified immunity. *See Ringuette v. City of Fall River*, 146 F.3d 1, 6 (1st Cir. 1998) (holding that when factual disputes exist pertaining to qualified immunity that cannot be resolved on summary judgment, "judges have sometimes deferred a decision until the trial testimony was in or even submitted the factual issues to the jury").

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion for Summary Judgment (ECF No. 21) is DENIED.

IT IS SO ORDERED,

_____
Mary S. McElroy
United States District Judge
October 28, 2021
.